This appeal is prosecuted by one of the defendants, B. F. King, Jr., from a judgment for plaintiffs in two cases which were consolidated and tried together by consent of counsel and order of the court.
The two cases were brought by the above-named plaintiffs, one against W. B. Crumpler and Ira Scott, partners trading as Crumpler Scott, and B. F. King, Jr., and D. R. Foster, and the other by the same plaintiffs against Godfrey Hart, D. R. Foster, and B. F. King, Jr.
The purpose of both actions was the same, and was to have the court declare that the plaintiffs were the owners and entitled to convey the property, which had been conveyed to them by the defendant D. R. Foster, freed from any trust or other claim of B. F. King, Jr., and to compel the defendants Crumpler Scott, and Godfrey Hart, to accept a deed and pay the purchase price of that portion *Page 376 
of the property purchased by each respectively, and which each had declined to take and pay for on account of an alleged claim by the defendant B. F. King, Jr., or alternately to make the defendant D. R. Foster liable on his covenants.
To better understand the case, it is necessary to make a short recital of the facts: D. R. Foster was engaged in the real estate business in Wilmington, and B. F. King, Jr., was working for him, and, at the instance of said King, and upon his assurance that he had already secured purchasers for the property, the said Foster purchased on 16 July, 1912, the tract of land, the title to which is in controversy, from A. D. Wessell and wife for the sum of $26,000, of which $6,000 was paid in cash, $1,000 by B. F. King, Jr., and $5,000 by D. R. Foster, who gave his note to the vendors for the sum of $20,000, with interest, payable two years after date, secured by mortgage upon the property for the deferred payments. At the same time D. R. Foster executed, and had recorded in the office of the register of deeds of New Hanover County the following paper-writing:
"To B. F. King, Jr., or his assigns. This is to declare that I, D. R. Foster, hold in trust for B. F. King, Jr., or his assigns an undivided one-half interest in the property on South Front street, described in a deed to me from A. D. Wessell, Sr., and wife. We have purchased the property jointly at the price of $26,000. I have executed a mortgage for $20,000 thereon and have advanced $5,000 in cash; King has advanced the balance of $1,000. The property is to be sold by us, and after the above cash advances are repaid, the net profits shall be divided equally, loss and expense shall be borne equally.
"In the event of my death or inability, I hereby appoint (354) B. F. King, Jr., or the assignee whom he shall appoint, to execute proper conveyance and otherwise carry out the trust.
"Witness my hand and seal this 16th day of July, 1912.
"D. R. FOSTER. (Seal)."
The debt secured by the mortgage on this property was not paid, and the land was advertised and sold by the mortgagee, Wessell, and bid off, and a deed taken for it, by Foster, who erroneously thought he thereby became the sole owner of the property, freed from any trust or obligation which might have been created by the above-quoted paper-writing, but Foster at the same time offered to allow the said B. F. King, Jr., to retain his one-half interest in the profits on a resale, if he would put up $500 to help carry the loan, and this King at first promised, but found himself unable to do, and finally *Page 377 
told Foster that he was unable to raise the money, and would claim no further interest in the property, and that he could sell it or dispose of it as he saw fit.
The defendant Foster was unable to sell the property, and was compelled to carry it unaided and at considerable expense in the way of insurance, taxes and repairs, until the rise in price which took place generally in 1918, and on 14 May, 1918, sold and conveyed the property to the plaintiffs for the sum of $30,000, which the verdict finds to be the best price he could obtain, and that the sale was bona fide.
Plaintiffs caused this property to be subdivided into lots, and put up the same and sold them by public auction in the year 1920, and the defendants W. B. Crumpler and Ira Scott became the purchasers of one portion of the property and the defendant Godfrey Hart of another portion. After the sale by plaintiffs, King made claim to an interest in the property or the profits on these sales, arising out of the paper-writing dated 16 July, 1912; and Crumpler and Scott and Hart declined to accept deeds and pay the purchase money. Plaintiffs thereupon brought these suits as hereinabove referred to.
The answer of the defendants Crumpler Scott, set up the fact that they are willing to take the property, but that plaintiffs cannot convey a good and indefeasible title free from trusts, etc., because B. F. King, Jr., claims an interest therein; the defendant Godfrey Hart in his answer, denies that plaintiffs had, and could convey, a good and indefeasible title in fee simple for the same reason; the defendant B. F. King, Jr., in his answer, claims that he was half owner of the property at the time that it was sold by plaintiffs to the defendants Crumpler Scott and Godfrey Hart, but is willing to affirm the sale to them on condition that he is paid one-half the net profits of the purchase and sale of the property.
The cases were consolidated and tried together before a jury upon the issues set out in the record, and resulted (355) in a finding that King had no interest, by way of trust or otherwise, in said property, and was not entitled to any profits upon a just accounting between him and the defendant D. R. Foster.
The issues as submitted to the jury, with the answers thereto, were as follows:
"(1) Did the defendant B. F. King, Jr., assent to the sale of the Wessell property by the defendant Foster? Answer: Yes.
"(2) Did the defendant Foster make a bona fide sale of the property for the best price which he could obtain? Answer: Yes.
"(3) What amount, if anything, is due from the defendant Foster to the defendant B. F. King, Jr., upon a fair and equitable *Page 378 
accounting of the purchase and sale of the Wessell property? Answer: Nothing.
"(4) What amount, if anything, is due from the defendant B. F. King, Jr., to the defendant Foster upon a fair and equitable accounting of the purchase of the Wessell property? Answer: Nothing."
From this judgment the defendants Crumpler Scott noted an appeal, as did also the defendant Godfrey Hart, but their appeals have been abandoned, and this appeal involves only the claim of B. F. King, Jr.
The defendants, B. F. King, Jr., and Crumpler Scott, and Godfrey Hart, insisted that the deed from Wessell and wife to D. R. Foster, dated in 1912, together with the declaration of D. R. Foster hereinbefore recited, constituted Foster a trustee for themselves (Crumpler Scott, and King), as beneficiaries, and this was freely admitted by the defendant Foster and not controverted by the plaintiffs. But the defendant King insisted, through his counsel, that he is the equitable owner of a one-half interest in the property and that his equitable estate, or interest in the property, could not be conveyed, terminated or otherwise disposed of otherwise than by a formal deed of conveyance by him, or by some act or conduct of his which would operate as an estoppel, and he denied that there was any such thing, and that he still owned the said interest.
On the other hand the defendant Foster contended, and a perusal of the record will show, that the jury decided that the property was purchased by Foster from Wessell at the instance of King, to be resold and the profits or losses divided equally. And this view of the case was concurred in by the plaintiffs and adopted by the court. So the whole controversy turns upon the simple point whether the interest of B. F. King, Jr., could be transferred, terminated or disposed of by a deed from Foster, the grantee and trustee, to a purchaser by and with the assent of King, expressed by word or conduct, or whether King must join in the deed.
The assignments of error state and restate variously, (356) and somewhat redundantly, the actual basis for a recovery on which B. F. King, Jr., relied in the court below, and which is clearly and sufficiently expressed in the second, sixth and seventh assignments of error, the seemingly unavoidable repetition being thought necessary to emphasize and clarify his main contention. Those are as follows:
"Second. That the court erred in allowing and permitting the plaintiffs to ask and have Mr. Foster to testify to what he, Foster, said was the exact contract and agreement he had with King *Page 379 
regarding the handling and the sale of the property, the title to which is in dispute, as shown by the defendant's second exception, for the reason that it appears that the agreement was in writing under seal, signed and recorded, and that as a matter of law, after the said agreement was entered into, the defendant, B. F. King, Jr., could not convey his interest, or lose his rights in the property, or be cut off from his interest therein, by parol, or oral statement, or without a valuable consideration.
"Sixth. That the court erred in allowing the plaintiffs to ask the witness Foster, `Now state to his Honor and the jury what authority he gave you to sell, and his abandonment of the agreement, if any?' and have the witness answer the same, as shown by the defendant's eighth and ninth exceptions.
"Seventh. That the court erred in allowing and permitting the plaintiffs and the defendant Foster to offer any evidence of the witness Meredith, which in any way tended to cut off the interest of B. F. King, Jr., in the property by parol declaration, as shown by the defendant's tenth exception."
On the trial counsel for Foster and for the plaintiffs admitted that Foster did not relieve himself of the trust, as he at the time erroneously supposed that he did, by purchasing the property at the mortgage sale of Wessell; and they further admitted that by the sale of the property by Foster to the plaintiffs, with the concurrence of King, the latter was still entitled to one-half of the net profits made, and was obliged to pay one-half of the net loss, if there should be a loss. As said above, this view of the matter was adopted by the presiding judge, and the case was tried on that theory.
The jury found by the answer to the third issue that on a just accounting, after making proper deductions, there were no profits and Foster owed King nothing.
Judgment upon the verdict, and the defendant, B. F. King, Jr., having reserved exceptions, appealed to this Court and assigned errors.
After stating the material facts of the case: The decision of this appeal must turn largely upon the construction, or meaning, of the trust declared by D. R. Foster in the writing dated 16 July, 1912. If D. R. Foster purchased the property in his own name for no other purpose than that of a resale by him and a *Page 380 
division of the net proceeds of such sale between him and B. F. King, Jr., there can hardly be any doubt that the trial proceeded correctly in the court below, but the defendant King contends that by that instrument an equitable estate was vested in him as to an undivided one-half of the land, and that the sale thereof was to be made jointly by Foster and himself, and consequently that the statute of frauds applied, and that no valid sale or transfer of his half interest or estate in the land could be made without his joinder in the deed, or other written instrument of conveyance.
We cannot concur entirely in this view. The title was validly in Foster, who bought at the Wessell sale, the deed having been made to him alone, with a declaration of trust, as contained in the writing of 16 July, 1912. It appears therefrom that Foster paid $5,000 on the purchase price of $26,000, and King $1,000, but the latter was to pay Foster $500 more to help him carry the loan, for which consideration Foster agreed that King might still enjoy the right to share with him in the net profits realized by a resale of the land, according to their prior agreement. But King did not comply with his part of this offer to let him in, so that he might participate in the net profits gained upon a resale of the property, and there is ample evidence to support the finding that B. F. King, Jr., finding that he was unable to carry out his part of the bargain, voluntarily and deliberately waived and abandoned his right thus to share in the proceeds of a resale, the consideration of which was that Foster should assume, and was compelled to assume, and pay King's share of the purchase price, and was otherwise forced to assume the burdens and inconveniences which, in law and in equity, rested solely upon King. There can be no question as to the sufficiency of the consideration, and King's claim might, perhaps, be otherwise met and overthrown by a resort to the principle of equitable estoppel. He should be thankful that he has been voluntarily let in by Foster at all, to enjoy the fruits of the resale, instead of imputing bad motives or conduct to him. He has been treated considerately, and even generously in the matter.
There seems to have been but one motive in the purchase (358) of this property, which was to hold the same securely for resale, and stripping the entire case of all irrelevant matter, it narrows itself down to the one pivotal thought in the mind of the defendant King, and that was, How much can I get out of it? King admits that the property was purchased for a resale, and admits that it was purchased for the purpose of making a quick return, for the evidence discloses a statement by him to the defendant Foster that he had the property as good as sold, or already sold, *Page 381 
at least as to one-half of it, with a good prospect for the sale of the other half, within thirty or sixty days. This was partly the consideration that moved Foster to buy, or to enter into the deal. When the title passed out of Wessell to Foster, and the sale was not made, as King had represented would be done, and King had surrendered all his right, Foster carried the burden, and in order to protect himself, had to mortgage other property of his own to prevent the loss of the $5,000 that he had paid on the first installment. Foster's and Meredith's evidence discloses what was done so that Foster might hold the property until the final sale.
There is little room for contention against the existence of a power of sale residing in Foster to sell the land he had bought at the Wessell sale. It is implied from the very language of the instrument itself, if not expressly given, and this is demonstrably so, without calling in aid any of the parol evidence. Council v. Averitt, 95 N.C. 131; Maxwell v. Barringer,110 N.C. 76. But even if there was no express power contained in the writing, it could be shown by parol, either that there was such a power or it could be implied from King's conduct, creating an estoppel upon him.
We cannot imagine a case where the doctrine of equitable estoppel could more justly have been applied than to this one. Where a party who has, or claims, a right, either openly and unequivocally abandons it, or does not assert it when he should do so, and induces another by his silence or conduct to believe that the right does not exist, or that he makes no claim to it, if he has it, and abandons and surrenders it, and the other party, acting upon such conduct as it was intended that he should do, and is induced thereby to do something, by which he will be prejudiced, if the party who so acted is permitted to recall what he has done, equity steps in and protects the party thus misled to his prejudice, and will forbid the other to speak and assert his former right, when every principle of good faith and fair dealing requires, and even demands, that he should be silent.Faw v. Whittington, 72 N.C. 324, where Justice Bynum says for the Court: "Such a renunciation, however, would seem to operate, not as passing an estate or interest in land, which cannot be done strictly under the act without writing, but to operate (359) as an equitable estoppel on the vendee to assert a claim to specific performance, where his conduct has misled the vendor intentionally."
Let us a little more definitely state the real pith of the controversy, and incidentally the reasons advanced in support of B. F. King's position. It would seem that the pivotal question upon which the case must turn and be decided is stated in the latter part of the *Page 382 
second assignment of error, appearing in our statement of the case, which is as follows: "After the said agreement was entered into the defendant B. F. King, Jr., could not convey his interest therein by parol, or oral statement, and without a valuable consideration."
This embraces fully all that can be said in his behalf, and his learned counsel have lost nothing of its strength by condensing it in the clearcut paragraph of the assignment above quoted.
If the court was correct in its rulings upon this question, then all of its rulings on testimony must necessarily be sound, because the testimony was offered and received to explain the circumstances of the original purchase and throw light upon the meaning of the declaration of trust and, in addition to that, was offered and accepted for the purpose of showing that the defendant King had surrendered and abandoned all interest in the property and consented to its sale by Foster.
We will defer, for the moment, further discussion of the statute of frauds in its relation to this case.
So the question comes back to this: What was the nature of the trust declared by Foster in favor of King? What was its purpose, and how could it be executed?
As stated above, the defendant King contends that he could not divest himself of whatever interest he had in the property or its proceeds, save by a deed of conveyance. Is this so?
The defendant Foster held the property upon trust to sell it and divide the proceeds equally between himself and King. It was not a naked trust, but a trust coupled with an express power to sell and an interest of his own, and although it is admitted that the sale could not be made without the assent of King, expressed or implied, that assent might be expressed orally or implied by conduct. As a matter of fact, it is a common transaction, and business men naturally assume that when property is conveyed to one person, or speculation, for resale for the benefit of himself and another, both can orally assent to the sale. Indeed this is the primary meaning of the words of the declaration: "The property is to be sold by us, and after the above cash advances are repaid, the net profits shall be divided equally, loss and expense shall be borne equally." (360) This language clearly does not mean that King was to join in the deed with Foster, because Foster alone holds the legal title, and it was so intended.
The contention of Foster then is, that the sale to the plaintiff conveyed a good title, free from all equities, and whatever rights the defendant King had were transferred to the proceeds, and this for the following reasons: *Page 383 
First. The defendant Foster held the property in trust to be sold by himself and King, and when the sale was made by the consent or concurrence of King this was a strict performance of the trust and an execution of the power of sale therein contained.
Second. That even if the sale to the plaintiff was a breach of trust, that is, was not a strict compliance with the declaration of trust by Foster, yet the assent, however, testified to by King ratifies the breach and makes the transfer valid.
Third. That even if the trust was not a trust for sale, but an equitable estate in the property, which could not be transferred by parol, yet whatever interest King had might have been abandoned by him without a deed.
We will consider briefly each of these propositions, because they seem to us to be almost self-evident, and if either one of them is sound, the sale to the plaintiffs was valid, and the only claim arising from said sale in favor of the defendant King is to share whatever net profits or losses there may have been arising out of the original purchase for $26,000, and the subsequent sale to plaintiffs for $30,000, and the latter conclusion seems to be conceded by King:
1. It is elementary that property may be conveyed to a trustee in trust for sale, and that it is not only the right of the trustee, but his duty, to sell if and when the terms of the power authorize it. 19 Am. St. Rep., note page 271 at bottom; 39 Cyc. 335; 28 Ency. of Law, p. 996; Flint's Lewin on Trusts, star page 424; In re Bedingfield Herrin's Contract
(1893), 2 ch. 332; Eakle v. Ingram, 100 Am. St. Rep., note p. 102.
In this case, as we have said and reiterated, it is clear to our minds that the purpose was for Foster to sell the property whenever he and King found a purchaser, and indeed it was understood in the beginning that King had already found a purchaser, and the sale to Foster was merely a means or process of transferring the property from the original vendor Wessell to the purchaser, by and with the consent of both Foster and King, and dividing the profits. This consent, the jury decided, after full hearing, King gave.
2. But even if the sale by Foster to the plaintiffs was not a strict performance of the trust and an execution of the power therein contained, he was justified in making the sale if the only other person having an interest in the property concurred (361) with him in desiring it.
This proposition is clearly stated by Mr. Maitland, who is generally regarded as one of the great law writers of the last quarter century, in his book on "Equity" (Ed. of 1909), at p. 106. The *Page 384 
doctrine is well stated in Butterfield v. Cowan, 112 N.Y., p. 486, by Judge Danforth, as follows: "The strength of the plaintiff's case is in the doctrine which governs the relation of trustee and cestui que trust. Assuming, as, in view of our former decision, we must, that there would have been responsibility on the part of the trustee in omitting to follow the terms of the mortgage by which he undertook to be bound, and that his dealing with the other defendant was a violation of those terms, it was possible for the plaintiff to absolve both the trustee and the other defendant from liability, either by acquiescing in the consummation of the transaction or by a positive adoption of it. Here there was both. It is quite clear that no cestui que trust can allege that to be a breach of trust which has been done under his own sanction, whether by previous consent or subsequent ratification. The general rule is that, either concurrence in the act, or acquiescence without original concurrence, will release the trustees. And there are no circumstances to make the plaintiff's case an exception. Whatever the trustee did which might otherwise have been found the subject of our just complaint, was done by the assent and sanction of the plaintiff." See, also, Pomeroy Equity Jurisprudence, sec. 1083, last sentence. The jury, as we have before stated, have found that King authorized or concurred in Foster's act.
3. Whatever equitable interest King had in the property was given up, surrendered or abandoned by him when he refused or failed to help carry the property longer and informed Foster that he could do nothing further, and that he could go on and sell the property, as testified by Foster and Meredith, and found by the jury.
In Gorrell v. Alspaugh, 120 N.C. 362, Alspaugh sold land to Hine, and the latter then executed a bond for title to Alspaugh for the land, upon payment of certain loans evidenced by notes. Alspaugh could not pay these notes, and surrendered them to Hine. Subsequently Alspaugh's creditors sued him and attempted to reach this property. It was claimed that Alspaugh had no interest in it, but the property belonged to Hine. It was held that, "While an equitable interest in land may not be transferred by parol, it may be abandoned or released to the holder of the legal title by matter in pais, provided such intention is clearly shown; hence the settlement made in 1894 between H. and A., being in good faith, extinguished A.'s equitable right and vested in H. a fee simple title." In Lewis v. Gay, 151 N.C. 168, p. 170, the Court says: "Parties may (362) by parol rescind or by matter in pais abandon rights in land." See, also, May v. Getty, 140 N.C. 310; Burns v. McFarland,146 N.C. 382; Matthews v. Thompson, 186 Mass. 14;Miller v. Pierce, 104 N.C. 389, and Faw v. Whittington, 72 N.C. 321, *Page 385 
where Justice Bynum explains this principle with great clearness and accuracy.
There was ample consideration, as we have shown, for the abandonment or surrender of this contract or interest in the property by King. The situation was this: King had induced Foster to purchase this property for the purpose of being resold, and relying upon King, Foster had done so; they were unable to sell, and it became an onerous burden to carry the property, and at the end of two years Wessell was pressing for the payment of his mortgage, and although repeatedly requested, King would do nothing to help Foster. Wessell agreed, however, that if they would raise $4,000 he would not foreclose, and Foster told King that if he would raise $500 of this amount he would raise the balance, and they could carry the loan on the property until better times came. This King failed to do, and told Foster that he could do nothing further, and to let it go. Then it was foreclosed, and Foster became the purchaser and himself raised $4,000 and gave a mortgage for $16,000.
Foster again offered to recognize the trust and to let King have his original share in the profits, in the event anything was made on the sale of the land, if he would raise $500 within six months, and this King thought he could do and promised to do. Foster, thinking it was necessary to put this agreement on the records had it, by the consent of King, written on the margin of the records, and King promised to sign it, but failed to do so. Foster continued to press King to put up the $500 to enable him to carry this loan from Wessell, which was secured by a mortgage on the property, and King kept promising, but finally told Foster that he could not raise any money to help, and that he could go on and dispose of the property as he saw fit, and that he hoped he would make something out of it. (This is shown by Foster's testimony, to be found in the record.)
In this connection King also told Meredith, who was then working with Foster, that he, King, who had been, and for some time theretofore ceased working with Foster, had left with Foster a souvenir in the shape of this purchase. Meredith also says that after King left Foster he often met King on the street, and he would ask if the Wessell property had been sold, and when he answered no, he would say, "I don't see why you don't sell it," and I suggested that he try to sell it himself, to which he replied something like this: that he had left a souvenir with Foster so that he could remember his days with him while he was there. King stated that he left a souvenir with Foster that would stay with him. King told me that he could not raise anything, and that he was out of it. (363) (This appears by Meredith's testimony in the record.) *Page 386 
Foster was compelled to assume the burden and carry the property upon his own shoulders because King not only would not help, but left the country.
If we are correct in the foregoing view (and we undoubtedly believe it to be the true one), assignments of error which challenge the correctness of the court's rulings upon evidence, both in admitting and rejecting it, are unsound, because the evidence was offered and received merely for the purpose of showing what the actual situation was, and what the conduct of all the parties to it was. The law permits some latitude in such cases.
This includes all assignments of error down to the tenth.
The tenth assignment is unsound for the same reason, as is also the eleventh.
The twelfth assignment cannot be sustained, because the proposition therein contained was admitted by the counsel for Foster and plaintiffs and adopted by the court, who charged the jury that Foster had not divested himself of the trust by his purchase at the foreclosure sale.
The thirteenth and fourteenth assignments were given in the general charge, so far as they were proper.
The fifteenth, sixteenth and seventeenth assignments of error are untenable for the reasons we have already stated.
So far as the eighteenth assignment is concerned, it lays down a rule of law correctly, but it is inapplicable to the case. We believe, and the jury so found, that Foster and King did both assent to the sale by Foster to the plaintiffs.
As to the nineteenth assignment of error, the general charge of the court to the jury contained all on this subject to which the defendant King was entitled, because the court charged that the purchase by Foster at the foreclosure sale did not divest King of his rights, and that he still had the right to share equally in whatever profits were made upon the sale, but was also under obligation to pay one-half of the expenses incurred in the maintenance of the property, and that the jury found upon sufficient testimony, in answer to the third issue, that there was nothing due to King under a just accounting, because the maintenance, upkeep, taxes, etc., of the property exceeded the rents which could be, and were, obtained by Foster by more than $2,000.
As to the twentieth assignment of error, in the statement of the record, it is manifest that the court could not have given this charge.
The twenty-first assignment of error: This assignment is a mere repetition of those discussed in the earlier portion of this opinion, and will not again be considered. The third paragraph of that *Page 387 
assignment cannot be established as a matter of fact. We cannot agree that the court did what it stated in this assignment; (364) but, on the contrary, the learned judge permitted the jury to find not only from King's own language, but from his conduct, that he had abandoned whatever equity he might have had. The remaining part of this assignment is without merit in law and in fact.
The twenty-second assignment of error is but a repetition of the same proposition already fully discussed.
We promised to revert to the question as to the statute of frauds. In this case there was no contract to convey land, or any interest therein, as between Foster and King; the precise agreement was (excluding all other questions which justify Foster's action) that the land should be sold to some third person, and the net proceeds divided. Foster had the legal title, which he held for the purpose of executing the trust imposed upon it by the written stipulation. It is spoken of therein as an undivided one-half interest in the property held in trust by Foster for King, and that "the property is to be sold by us" (them), that is, Foster and King, but it all plainly means, when the context is considered, that the property was bought at the sale on joint account and solely for the purpose recited therein, which is, that it should be resold to make what profit there was in the venture, and sold, too, by Foster, the trustee. It is again recited in the instrument that Foster had mortgaged the land, in his own name as mortgagor, for $20,000, and advanced $5,000 in cash, and King the balance of $1,000, and that they were to divide equally the net profits of a resale. There was no objection by King to Foster's mortgaging the property in his own name. The entire instrument when taken and considered within its four corners, shows conclusively what the parties meant, and that their only intention was that Foster should hold the land in trust to carry out their design of selling the land for the profit that was in it, and there was no thought that Foster should even convey one-half of the estate to King, but that the latter should have one-half of the net profits, "loss and expense, to be borne equally." Foster "held it in trust" for the consummation of the joint venture, and for no other purpose, and no one of the interested persons was justified in thinking that King had any other right in the transaction. Deeds and other writings are to be construed so as to effectuate the intentions of the parties, as that is ascertained from the language of the instrument. Gudger v. White, 141 N.C. 507; Triplett v.Williams, 149 N.C. 394; Kea v. Robeson, 39 N.C. 427, and especially S.c., 40 N.C. 373. In Gudger v. White, supra, it was held, referring to what had been said *Page 388 
in prior cases: Courts are always desirous of giving effect to instruments according to the intention of the parties, so far as the law will allow. It is so just and reasonable that it should be so (365) that it has long grown into a maxim that favorable constructions are put on deeds. Words shall always operate according to the intention of the parties, if by law they may, and, if they cannot operate in one form, they shall operate in that which by law shall effectuate the intention. This is the more just and rational mode of expounding a deed, for, if the intention cannot be ascertained, the rigorous rule is resorted to, from the necessity of taking the deed most strongly against the grantor, citing Kea v.Robeson, supra; Rowland v. Rowland, 93 N.C. 214; Campbell v.McArthur, 9 N.C. 38; Ritter v. Barrett, 20 N.C. (Anno.) 266. And Justice Ashe said for the Court, in Rowland v. Rowland, supra, at p. 218: "Intentio inservire, debet legibus, non legis intentioni, and as far as it may stand with the rule of law, it is honorable for all judges to judge according to the intentions of the parties, and so they ought to do (1 Coke, p. 19), and Justice Blackstone, in the Rules of Interpretation laid down by him, 2 vol. 286, says: `That the construction be made upon the entire deed, and not merely upon the disjointed parts of it. Num ex antecedentibus, et consequentibus fitoptima interpretatio, and therefore that every part of it (if possible) be made to take effect, and no word but what may operate in some shape or other, Nam verba debent intelligi cum effectoe et res magisvaleat quam pareat. And in Jackson v. Blodgett, 16 Johnson 172, the same rule is announced, `that the construction must be made on the entire instrument, after looking, as the phrase is, at the four corners of it.' See, also, 2 Smith's Leading Cases, 466, where numerous authorities are cited upon the subject.'"
So that upon this construction of the written trust, it is clear, as a conclusion, that the case, so far as respects the statute of frauds, falls within the principle of Michael v. Foil, 100 N.C. 178, at 188, where a similar agreement was made, and it was held that a contract to sell land and divide the profits was not within the statute. Manning v. Jones,44 N.C. 368. Justice Davis says in Michael v. Foil, supra: "In Trowbridge v.Wetherbee, 11 Allen's Mass. Rep. 361, it is held that a parol promise to pay to another a portion of the profits made by a promissor on the purchase and sale of real estate, is not within the statute of frauds, and may be proved by parol. See, also, Sherrill v. Hagan, 92 N.C. 345." We have, inNewby Weeks v. A. C. Realty Co., ante, 34, discussed fully this question as to the application of the statute of frauds to agreements of this kind, and we there held that the statute had no application whatever. Our *Page 389 
language was this: "The parties contracted with reference to the profits to be realized upon a resale of the land, and not with the view of acquiring title to any part of the land. They already had the title, and the land itself was to be held in trust, for the purpose of realizing the profits of another sale of it." No further comment is required. (366)
That King expected Foster to sell the land by himself, and without the joinder of Foster, can well be inferred from the last paragraph, but one, of the written agreement dated 16 July, 1912, where Foster designates King to act if Foster should die before consummating the matter, or bringing it to a final conclusion. Besides, it appears, as we have already stated in a former part of this opinion, that King was willing to affirm the sale if he is allowed one-half of the net proceeds, and whether he so expressly agreed or not, his words and conduct plainly demonstrate that it was all he expected to be done. There is no way of looking at the case that does not disclose that, in any event, the sale was to be valid, even if he had a legal or equitable estate in the land and was legally entitled to join in the sale of it. Judged by his own conduct throughout the course of his dealing with Foster, as to the land and its sale, his case is cut up by the roots.
The defendant Foster agreed to let King come in and share in the net profits of sale, but the jury have found that upon a fair and just accounting, when he is charged with his part of the costs and expenses, and what he agreed to contribute, there will be nothing left for him. Foster was generous towards him in agreeing to account to him, when he had clearly given up and abandoned his former right, but however this may be, the jury have settled the matter against him after he has had a fair opportunity to be heard and has been fully heard upon all questions involved.
There is no reason for disturbing the verdict or judgment.
No error.
Cited: Mote v. Lumber Co., 192 N.C. 464; Scott v. Bryan, 210 N.C. 481;Oil Co. v. Jenkins, 212 N.C. 144; Hare v. Weil, 213 N.C. 488; Bell v.Brown, 227 N.C. 322. *Page 390